**EQUAL EMPLOYMENT OPPORTUNI-TY COMMISSION, and the City of New York, Plaintiffs,**

v.

**LOCAL 638 ... LOCAL 28 OF THE SHEET METAL WORKERS' INTER–NATIONAL ASSOCIATION, et al., Defendants.**

No. 71 Civ. 2877(RLC).

United States District Court, S.D. New York.

June 24, 1998.

As Amended July 6, 1998.

Corporation Counsel of the City of New York, New York City (Michael D. Hess, Hilary B. Klein, Paul Kazanoff, of counsel), for City of New York.

Attorney General of the State of New York, New York City (Dennis Vacco, Angie Martell, of counsel), for New York State Division of Human Rights.

Edmund P. D'Elia, P.C., New York City (Edmund P. D'Elia, Charles J. Cooper, of counsel), for Sheet Metal Workers Local Union 28.

Gold, Farrell & Marks, New York City (Martin R. Gold, William Rothberg, Robert

P. Mulvey, of counsel), for Sheet Metal and Air Conditioning Contractors Ass'n of New York City, Inc. and Sheet Metal and Air Conditioning Contractors National Ass'n of Long Island, Inc.

### *OPINION*

ROBERT L. CARTER, District Judge.

Plaintiff City of New York seeks an order modifying the court's Contempt Order dated February 23, 1995, and amended March 8, 1995, (the "Contempt Order"). Pursuant to Rule 7, F.R. Civ. P. and the Order and Judgment in this case, dated August 28, 1975 ("O & J"), plaintiff asks that the Contempt Order be amended to include the following: (1) an order enjoining Local 28 from charging fees and back dues to nonwhite journeypersons who seek reinstatement or reinitiation to the union, pending a determination by Special Master, David Raff, as to whether they were underemployed during the period preceding their period of suspension or termination, (2) an order mandating that, upon reinstatement or reinitiation, nonwhite journeypersons be restored full membership rights, including but not limited to funeral benefits, (3) an order reinstating the back pay remedy according to certain procedures (as described in the declaration of Paul Kazanoff), (4) an order establishing a referral hall, (5) an order enjoining union business agents, union employees, or other agents of the union from engaging in job referrals, (6) an order enjoining the union to pay for plaintiff's statistical expert to analyze contractors' work records on an ongoing basis, (7) an order awarding plaintiff $159,019.78 plus prejudgment interest from the date of the Contempt Order for expert fees incurred in the preparation of plaintiffs' contempt motion, and (8) other such relief as the court deems just and proper.

### *I. Background*

The background of this case has been documented in detail in previous opinions of this court, the Second Circuit, and the Supreme Court, *Local 28 of Sheet Metal Workers' Int'l Ass'n v. EEOC,* 478 U.S. 421, 106 S.Ct. 3019, 92 L.Ed.2d 344 (1986); *E.E.O.C. v. Local 638*

... *Local 28 of Sheet Metal Workers' Int'l Ass'n,* 753 F.2d 1172 (2d Cir.1985), *aff'd,* 478 U.S. 421, 106 S.Ct. 3019, 92 L.Ed.2d 344 (1986); *E.E.O.C. v. Local 638,* 700 F.Supp. 739 (S.D.N.Y.1988) (Carter, J.); *E.E.O.C. v. Local 638,* 674 F.Supp. 91 (S.D.N.Y.1987) (Carter, J.); *E.E.O.C. v. Local 638,* 1982 WL 445 (S.D.N.Y. Aug.16, 1982) (Werker, J.), *aff'd in part, E.E.O.C. v. Local 638,* 753 F.2d 1172 (2d Cir.1985); *E.E.O.C. v. Local 638,* 421 F.Supp. 603 (S.D.N.Y.1975) (Werker, J.), *aff'd in part,* 532 F.2d 821 (2d Cir.1976), with which familiarity is assumed.

## II. Present Proceeding

### A. 1995 Contempt Order Issued by this Court

In 1995, this court considered a motion for contempt against the defendants. In that motion the plaintiffs alleged that the union had violated the outstanding O & J and Amended Affirmative Action Program and Order ("AAAPO") by failing to achieve the 29.23% membership goal mandated by the AAAPO, by failing to ensure equal work opportunities for its nonwhite members, and by failing to keep accurate and complete records. Specifically, the plaintiffs claimed that the union had inflated its census reports so as to make it appear as if it were closer to achieving the membership goal than it actually was; had permitted and contributed to a disparity between the hours worked by white and nonwhite members; and had adopted a reinitiation policy having a disparate impact on minorities. The plaintiffs sought a wide range of remedies for the alleged contempt.

In an order dated February 23, 1995, and amended on March 8, 1995, the court granted the motion on the basis that the union had failed to achieve the 29.23% membership goal and otherwise meet the requirements of the AAAPO and O & J. *E.E.O.C. v. Local 638 ... Local 28,* 889 F.Supp. 642, 656–68 (S.D.N.Y.1995) (Carter, J.). The finding of contempt also was supported by the court's determination that the union was liable for the disparity in work hours between white and nonwhite journeypersons and that the

union's reinitiation policy had a disparate impact on nonwhites. *Id.* at 652–68.

The contempt order mandated a variety of remedies. These included the following: (1) a recalculation of union's nonwhite membership goal, (2) back pay to underemployed nonwhite journeypersons, (3) an increase in the union's contribution to the employment, training, education, and recruitment ("ETER") fund, (4) a work share plan and hiring hall system to prevent future hours disparities between white and nonwhite journeypersons, (5) alterations in the unions reinitiation policy, (6) the appointment of a field monitor for the hiring hall system by the administrator[1] of this case, and (7) reasonable attorneys' fees and costs. *Id.* at 669–87. The court subjected the Contractors to the requirements of the work share plan and the hiring hall system. *Id.* at 671–83. The court deemed this relief minor and ancillary, but necessary to remedy the union's violations of the AAAPO and O & J. *Id.* at 672–79.

### B. Second Circuit's Ruling on the Contempt Order

On appeal the Second Circuit approved the issuance of the contempt order. *E.E.O.C. v. Local 638 ... Local 28,* 81 F.3d 1162, 1172–76 (2d Cir.1996).

In affirming the court's order, the Circuit Court upheld many of the remedies mandated by the district court. It held that it is within the district court's discretion to reformulate the nonwhite membership goal required by the AAAPO, *id.* at 1178–79, and affirmed the Special Master's authority to appoint a field monitor, to delineate the monitor's duties, and to indicate to which information the monitor should have access. *Id.* at 1181. The Court of Appeals also upheld the district court's finding that the union's policy of barring from reinitiation journeymen whose membership had been suspended for nonpayment of dues for more than two years (the "two-year rule") has a disparate discriminatory impact upon nonwhite journeypersons. *Id.* at 1175–76.

---

1. The original O & J used the term "administrator" to refer to the individual appointed to oversee this litigation, while Rule 53, F.R. Civ. P.

uses the term "Special Master." Both terms refer to the same individual, David Raff, and are used interchangeably in this opinion.

However, the Court of Appeals vacated that part of the district court's opinion which limited the union's fee and back dues requirements for reinitiation. *Id.* at 1176. The Circuit held that the district court violated the union's due process rights by limiting the union's ability to collect these fees and dues, absent notice and a hearing on the discriminatory effect of these policies. *Id.*

Moreover, the Circuit Court found that the back pay award was not narrowly tailored, and vacated the court's order to the Special Master to hold hearings on the amount of such awards. *Id.* at 1177. In rejecting the back pay award, it was noted that, in crafting this remedy, the district court impermissibly had failed to take account of the union's financial status. *Id.*

The Court of Appeals reversed the district court's extension of the order's requirements to the Contractors. Specifically, the Court held that the hiring hall and job rotation systems imposed impermissible burdens on the Contractors, and that it was not within the court's authority to require the Contractors to cooperate in the field monitor's efforts to investigate and conciliate job related complaints. *Id.* at 1179–80. In addition, it was held that the Special Master lacked authority to enter an injunction against the Contractors. *Id.* at 1182.

Finally, the district court's ruling regarding the ETER fund was modified. While finding that the district court may order the union to increase its contribution to the fund, the Second Circuit held that the union retained the ability to challenge the specific amount of increase ordered by the court. *Id.* at 1178.

Accordingly, on remand the court's obligation is to consider the back pay award, the limitation on the fees the union may charge underemployed nonwhite journeypersons for reinitiation, the hiring hall system, and plaintiff's request for certain amendments to the Contempt Order, in light of the Second Circuit's decision and instructions. In addition, the City and the union have submitted memoranda of law and affidavits to support their positions on the issues presented on remand, and the court has considered their submissions and arguments in reaching its decision.

## III. Discussion

### A. The Reinitiation Policy

■ The Second Circuit having determined that the union is entitled to due process as to whether the union's policy of charging underemployed nonwhite journeypersons fees and back dues is contumacious, the court must decide what type of process is due to the defendants. Defendants argue that they are entitled to a full evidentiary hearing on the issue of whether this policy is contumacious. (Def.'s Mem. of Law at 4). They base this contention on their characterization of the Second Circuit's action regarding the court's rulings relating to fees and back dues for reinitiation as the "vacation of the liability determination with respect to the Union's reinitiation policy." *Id.* at 2.

The court agrees that the Second Circuit has instructed it to reach a determination as to whether the union's practice of charging fees and back dues to underemployed nonwhite members violates the outstanding orders in this case. The opinion explicitly states as much.

> Local 28 was given no opportunity to address whether the other aspects of its policies concerning the non-payment of dues violated the court's orders. Thus, we affirm only the finding that the two-year limitation is a contempt, and vacate the district court's other findings regarding Local 28's membership policies. On remand, the district court is free to consider, upon appropriate notice to Local 28, whether any of the other membership conditions violate its orders.

*Id.* at 1176.

Contrary to defendants' contention, however, nothing in the Second Circuit's opinion requires the court to reach such a determination only after a full evidentiary hearing. The Court of Appeals' mandate to the district court was not specific. The Second Circuit did not conclude that the court could reach a determination regarding whether the relevant policies violate its orders only by holding a full evidentiary hearing on the matter. Rather, the Circuit's language was general in nature, instructing the district court to pro-

vide defendants with an "opportunity to address whether other policies concerning the non-payment of dues violated the court's orders." *Id.* The Court of Appeals left it to the district court to reach a decision concerning the nature of the process due to defendants.

Nor is the union's position supported by the precedent on civil contempt.[2] Full evidentiary hearings generally are not required in cases where civil contempt sanctions are imposed. In *International Union, United Mine Workers of America v. Bagwell,* 512 U.S. 821, 827–29, 114 S.Ct. 2552, 129 L.Ed.2d 642 (1994), the Supreme Court explained that "because civil contempt sanctions are viewed as nonpunitive and avoidable, fewer procedural protections for such sanctions have been required." *Id.* at 831, 114 S.Ct. 2552. Civil sanctions may be imposed "in an ordinary civil proceeding upon notice and an opportunity to be heard." *Id.* at 827, 114 S.Ct. 2552. "Neither a jury trial nor proof beyond a reasonable doubt is required." *Id.*

While carving out an exception to this general rule in cases involving out-of-court disobedience to complex injunctions in which crucial facts are in close dispute, which may necessitate the holding of a hearing, the calling of witnesses, and the presentation of evidence by the parties, *id.* at 834, 114 S.Ct. 2552, the *Bagwell* Court expressly left "unaltered the longstanding authority of judges to ... enter broad compensatory awards for all contempts through civil proceedings." *Id.* The case cited by the Court in support of this proposition was its decision in the instant case upholding Judge Werker's 1982 civil contempt order, *Local 28 of Sheet Metal Workers' v. EEOC,* 478 U.S. 421, 106 S.Ct. 3019, 92 L.Ed.2d 344 (1986). Thus, the Court acknowledged that the exception carved out in *Bagwell* is inapposite to this case.

In any event, the nature of the issues presented on remand makes a full evidentiary hearing and extensive fact-finding unnecessary. The evidentiary record in this case

is abundant, extending over two decades and including the evidence presented by the parties in the hearing on plaintiff's 1995 contempt motion. The great volume of evidence submitted by the parties over time and the court's familiarity with the record mitigates the need for a full evidentiary hearing in which extensive findings of fact would be made.

Moreover, the court's judgment on whether the reinitiation procedures in question are contumacious turns on legal analysis not on disputed issues of material facts. This conclusion is based on two realities.

First, the facts that underlie the specific practice alleged to be contumacious are not controverted. The plaintiffs agree with the defendant that the union's policy of charging fees and back dues for reinitiation is race neutral on its face. (Pl.'s Motion at 2). The absence of a dispute over the nature of the policy makes a full evidentiary hearing in which the court would conduct extensive findings of fact unnecessary. *See Sassower v. Sheriff of Westchester Cnty.,* 824 F.2d 184, 190 (2d Cir.1987) (holding that due process requires an evidentiary hearing when parties' submissions in contempt proceedings raise disputed issue of material fact); *Agur v. Wilson,* 498 F.2d 961, 965 (2d Cir.) (rejecting a constitutional challenge to New York's civil contempt statutes on ground that they allow findings of contempt without evidentiary hearings and noting that New York courts generally construe statutes to require hearing where affidavits reveal genuine issues of fact), *cert. denied,* 419 U.S. 1072, 95 S.Ct. 661, 42 L.Ed.2d 669 (1974).

Second, since the underlying facts about the reinitiation practices are uncontroverted, to reach a determination of whether the union's facially race neutral policy concerning payment of fees and back dues for reinitiation is contumacious requires the court to consider the practice in light of the language contained in the O & J and AAAPO, its own

---

**2.** This court has continuing jurisdiction over the underlying facts in this case and has inherent powers to enforce the remedial orders previously issued herein. O & J, ¶ 28. Since enforcement of the O & J and AAAPO is the subject of this controversy, there is no question that the con-

tempt sanctions at issue in this case—like those the court imposed in 1982, 1983, and 1995 to compel the union to comply with its remedial orders—are compensatory in nature, and thereby, civil.

prior decisions, those of the Second Circuit and the Supreme Court.

The above cited circumstances distinguish the instant action from the exception carved out in *Bagwell*, 512 U.S. 821, 834, 114 S.Ct. 2552, 129 L.Ed.2d 642 (1994). Accordingly, the court concludes that it does not require a full evidentiary hearing in order to reach its determination on the issue of the contumacy of the reinitiation policies in question. Moreover, the issue of whether the policy is contumacious is discussed thoroughly in the parties' submissions, and the court concludes that a consideration of the arguments made therein, together with the lengthy, pre-existing record in this case, is sufficient to guarantee the union's due process rights.[3]

### 1. Liability Determination

█ In order for the court to find contempt on the part of the union for not complying with a court order, the order must be "clear and unambiguous, the proof of noncompliance [must be] ... 'clear and convincing,'" and the union must not have "been reasonably diligent and energetic in attempting to accomplish what was ordered." *Local 28*, 753 F.2d at 1178 (quoting *Powell v. Ward*, 643 F.2d 924, 931 (2d Cir.)), *cert. denied*, 454 U.S. 832, 102 S.Ct. 131, 70 L.Ed.2d 111 (1981). It is not necessary that the union willfully disobey the court's order for there to be contempt. *See McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 191, 69 S.Ct. 497, 93 L.Ed. 599 (1949); *Local 28*, 753 F.2d at 1178. Parties are bound by a court order until the court modifies the order or releases them from it, and defendants who act without first asking the court to clarify the order "act [ ] at their own peril." *McComb*, 336 U.S. at 192, 69 S.Ct. 497; *see also Maness v. Meyers*, 419 U.S. 449, 95 S.Ct. 584, 42 L.Ed.2d 574 (1975).

Defendants have the burden of production in such cases, and this burden may be difficult to meet, especially "where the defendants have a long history of delay and the plaintiffs' needs are urgent." *Badgley v.*

*Santacroce*, 800 F.2d 33, 36 (2d Cir.1986), *cert. denied*, 479 U.S. 1067, 107 S.Ct. 955, 93 L.Ed.2d 1003 (1987); *see also EEOC v. Local 580, Int'l Ass'n of Bridge, Structural & Ornamental Ironworkers*, 669 F.Supp. 606, 611 (S.D.N.Y.1987) (Carter, J.), *aff'd*, 925 F.2d 588 (2d Cir.1991). The burden is "certainly not less where the obligations in question were accepted in a decree entered on consent." *Aspira of N.Y., Inc. v. Board of Educ. of N.Y.*, 423 F.Supp. 647, 654 (S.D.N.Y.1976) (Frankel, J.).

█ The union may defend against the contempt citation by showing that circumstances have arisen, unforeseeable when the order was issued, that make compliance with the court's order presently impossible. *Id.* at 757; *see also Badgley*, 800 F.2d at 36. An impossibility defense will not lie where the defendant cannot demonstrate that it has made diligent efforts to comply with the order, and no circumstances have changed. *See United States v. Chase Manhattan Bank, N.A.*, 590 F.Supp. 1160 (S.D.N.Y.1984) (Goettel, J.) (refusing to permit impossibility defense where no facts had changed).

█ Having considered the parties' arguments for and against contempt, the court finds that the policy at issue is contumacious in a narrow context: to the extent that nonwhite journeymen who were underemployed between 1984 to 1991 because of the union's discrimination were 1) suspended or terminated from the union, and 2) subsequently required either to pay fees and back dues for reinitiation of their membership, or refused union membership because of the two-year rule. Given the court's prior finding that the two-year rule is discriminatory, *E.E.O.C. v. Local 638 ... Local 28*, 889 F.Supp. 642, 664–65 (S.D.N.Y.1995) (Carter, J.), and the Second Circuit's affirmance of that finding on disparate impact grounds, *E.E.O.C. v. Local 638 ... Local 28*, 81 F.3d 1162, 1173–76 (2d Cir.1996), this conclusion is axiomatic.

The logic of a finding of contempt in this instance is clear because the practice in ques-

---

**3.** There is one exception to this conclusion, which pertains to the use of a referral hall with respect to fan maintenance workers and workers hired pursuant to a target agreement. As dis-

cussed *infra*, pp. 465–66, the court refers this matter to the Special Master for evidentiary findings.

tion directly undermines compliance with the O & J and AAAPO. Paragraph 1 of the O & J permanently enjoins the union and its officers from "engaging in any act or practice which has the purpose or the effect of discriminating in ... admission to membership in Local 28 ... on the basis of race, color, or national origin." Paragraph 11 of the O & J and paragraph 3 of the AAAPO mandate that the union make "regular and substantial progress" toward achieving 29.23% nonwhite membership. These provisions of the court's remedial orders expressly forbid the union to formulate or establish membership policies that discriminate against nonwhite journeypersons and inhibit their membership in the union.

These mandates are undermined by the union's practice of charging this subset of nonwhite workers fees and backdues for reinitiation. Whereas the clear and unambiguous purpose of the O & J and AAAPO is to increase membership of nonwhites in the union, this practice functions to decrease employment opportunities for nonwhites in the union. Like the two-year rule previously struck down by the court, requiring the subset of journeypersons in question to pay a fine for each month excluded from membership would impede union membership among individuals whose ability to pay these fees has been undercut by the union's discriminatory practices. That their ability to get work has been undermined by the union is evinced by a number of factors, *inter alia,* 1) evidence of statistical disparity between hours worked by whites and nonwhites, which the Second Circuit has found to demonstrate the union's denial of equal employment opportunities to nonwhite journeypersons in violation of the O & J, *E.E.O.C. v. Local 638 ... Local 28,* 81 F.3d 1162, 1172–73 (2d Cir.1996), 2) discrimination by union business agents in making referrals to the contractors, which the Second Circuit aff'd. as a basis for contempt, *id.* at 1162, 3) evidence that the union failed to invoke Art. V, § 6 and Art. V, § 7 of the CBA with the contractors, which might have mitigated the white/nonwhite hours disparity, *id.* at 1175–76, and 4) the union's adoption of the two-year rule, which the Second Circuit found to be discriminatory, *id.* at 1176. *See also id.* at 1171–72 (finding union's

failure to reach the 29.23% nonwhite membership goal a valid basis for contempt).

Thus, although facially race neutral, the union's practice of charging the particular subset of journeypersons in question fees and backdues for reinitiation has the effect of discriminating against nonwhites in their readmission to the union. The practice has a disparate negative impact on nonwhites because these individuals are overrepresented among journeypersons terminated for their inability to pay dues. From 1984 to 1991, 32.5% of the journeypersons suspended for nonpayment of dues were nonwhite, while nonwhites comprised only 21% of such journeypersons. *EEOC v. Local 638 ... Local 28,* 889 F.Supp. 642, 665 (S.D.N.Y.1995) (Carter, J). While suspended whites and nonwhites were equally likely to be terminated for nonpayment of dues, the termination rate of nonwhites is almost double that of whites, (10.5% for nonwhites, compared with 5.7% for whites) because nonwhites are disproportionately suspended. *Id.* There is an obvious relationship between lack of work and termination for non-payment of dues. A member who is in the bottom 10% of journeypersons in terms of hours worked per year is four times more likely to be suspended the ensuing year and ultimately terminated than a member not in the bottom 10%. *Id.* The hours disparity between whites and nonwhites contributes to the disproportionate suspension and termination rates of nonwhites. *Id.* Such discrimination is legitimized—indeed rewarded—by the union's practice of charging the very same workers who have experienced discrimination in terms of work hours and suspension and termination rates fees and backdues for reinitiation. This facially race neutral practice ignores the fact of discrimination—treating the subset of nonwhite journeymen who were subjected to discrimination during the years 1981 through 1994 as if the discrimination never happened—as if it has had no financial impact on these journeypersons.

The union should not be allowed to extract fees and backdues from nonwhite journeymen who were suspended or terminated from the union as a result of the union's discrimination. Any other result would enable the

union to profit from its unlawful conduct in failing to comply with the court's orders. *See International Union, United Mine Workers v. Bagwell,* 512 U.S. 821, 829, 114 S.Ct. 2552, 129 L.Ed.2d 642 (1994) (holding that civil contempt is designed to "coerce the defendant into compliance with the court's order, [or] ... compensate the complainant for losses sustained"); *United States v. United Mine Workers of America,* 330 U.S. 258, 303–04, 67 S.Ct. 677, 91 L.Ed. 884 (1947) ("Judicial sanctions in civil contempt proceedings may ... be employed for either or both of two purposes; to coerce the defendant into compliance with the court's order, and to compensate the complainant for losses sustained."). The court's obligation to prevent the practices in question from undermining its orders and coerce compliance is made especially clear by the fact that the union has repeatedly failed to comply with them. *See e.g., EEOC v. Local 638 ... Local 28 of Sheet Metal Workers' Int'l Ass'n,* No. 71 Civ. 2877, 1982 WL 445 (S.D.N.Y. Aug. 16, 1982) (Werker, J.) (issuing civil contempt order), *aff'd in part,* 753 F.2d 1172 (2d Cir. 1985), *aff'd,* 478 U.S. 421, 106 S.Ct. 3019, 92 L.Ed.2d 344 (1986).

Notwithstanding its repeated failure in the past to comply with the O & J and AAAPO and the discriminatory effect of the practice now at issue, the union argues that it should not be held in contempt because "there is no clear and convincing evidence that the Union has violated an unambiguous court order with respect to the aspects of the reinitiation policy at issue here." (Def.'s Mem. of Law at 4), citing *United States v. Local 1804–1, Int'l Longshoremen's Ass'n,* 44 F.3d 1091, 1096 (2d Cir.1995). True enough, *Longshoremen's Ass'n* holds that "a contempt holding will fall unless the order is 'clear and unambiguous,' and proof of non-compliance is 'clear and

convincing,' and the contemnor was not reasonably diligent in attempting to comply." *Id.* at 1096.

Far from suggesting that the union should not be held in contempt on the facts presented in this case, this standard supports a finding of contempt against the persistently foot-dragging union for the practice in question. In fact, *Longshoremen's Ass'n* takes the language that the union cites in its favor from *EEOC v. Local 580,* 925 F.2d 588 (2d Cir.1991), *affirming* 669 F.Supp. 606 (S.D.N.Y.1987) (Carter, J.). *Local 580,* which involved facts exceedingly similar to those in the instant action,[4] borrowed language from a prior phase of this case— specifically, another instance in which this court found the union in contempt for failing to comply with exactly the same O & J and AAAPO that it again stands accused of disregarding. *Local 580,* 925 F.2d at 594 (citing *EEOC v. Local 638 ... Local 28 of the Sheet Metal Workers' Int'l Ass'n,* 753 F.2d 1172, 1178 (2d Cir.1985), *aff'd,* 478 U.S. 421, 106 S.Ct. 3019, 92 L.Ed.2d 344 (1986)).

Given this reality, the union's argument is disingenuous, to say the least. Nothing has changed between 1986 and now about the O & J and AAAPO in terms of its clarity: the O & J or the AAAPO expressly enunciates the union's obligation to refrain from racially discriminatory membership policies and affirmatively to increase its nonwhite membership. The O & J forbids the union from "engaging in any act or practice which has the purpose *or effect* of discriminating in ... admission to membership in Local 28 ... on the basis of race." O & J ¶ 1 (emphasis added). The AAAPO requires the union to make "regular and substantial progress" toward achieving 29.23% nonwhite

---

**4.** In *Local 580,* the court found contempt against a union that had been found liable for racial discrimination for failing to comply with the terms of a consent decree into which it entered in 1978. 925 F.2d at 589. The decree at issue imposed specific obligations upon Local 580 to ameliorate the effects of past discrimination and ensure integration among its membership, including an affirmative action plan, new procedures for distributing employment referrals, recordkeeping requirements so that compliance with the decree could be ascertained. *Id.* at

590–91. The court had issued a civil contempt order because the union "consistently failed to comply with the requirements of the Consent Judgment over the years," leading to the district court finding it in contempt on "several occasions." *Id.* at 590. The Second Circuit upheld the court's contempt finding, stating that "judicial discretion in flexing its supervisory and enforcement muscles is broad," *id.* at 593, and that the "court has inherent power to enforce consent judgments." *Id.* at 594.

membership. AAAPO ¶ 3. For all the reasons discussed *supra*, "clear and convincing evidence" establishes that the union consistently has not complied with these terms.

What is left of the union's argument is the question of whether the practice in question—charging fees and back dues for reinitiation of nonwhite journeypersons underemployed between 1984 and 1991 because of the union's discrimination—falls within the scope of those practices enjoined by the O & J and AAAPO. The court finds no rational basis for the notion that the questioned practice contributes to the union's achievement of the 29.23% nonwhite membership goal; and logic supports the conclusion that the practice in question has the "effect of discriminating" against nonwhites in admission to the union. In short, the practice violates the O & J and AAAPO.

The union's argument that the court cannot find contempt because paragraph 22(d) of the O & J and paragraph 42 of the AAAPO *"expressly contemplate* that nonwhite members will be charged the same initiation fees and dues that are charged to white members" is entirely specious. For if the subset of nonwhite members in question were not repeatedly subjected to discriminatory practices, they, like similarly situated whites, would be in a position to work and to pay fees and dues for membership regularly, and the issues brought here would not be before the court.

Instead of attempting to ameliorate its past discrimination against nonwhites and bring them into the fold by taking meaningful steps towards achieving a racially integrated work place, the union repeatedly has disregarded the court's injunction against discrimination. Hence, the union has only itself to blame for again being held in contempt of court.

### IV. *Remedies for Contempt*

#### A. *Reinitiation Policy*

■ To remedy the discriminatory effect caused by the two-year rule and the union's practice of charging fees and back dues for reinitiation to the subset of journeypersons at issue, plaintiffs make several requests.

They seek 1) an order enjoining Local 28 from charging fees and back dues to nonwhite journeypersons who seek reinstatement or reinitiation to the union, pending a determination by Special Master, David Raff, as to whether they were underemployed during the period preceding suspension or termination; 2) an order requiring the union to give former members of the union notice of any remedies that the court orders regarding the reinitiation policies; 3) an order stating that such notice to be approved by plaintiffs' counsel before mailing, with disputes to be resolved by the Administrator; 4) an order requiring the union to refund any fees and backdues that may have been paid by the subset of nonwhite workers who are entitled to no-fee reinitiation; 5) and order requiring the union to restore these journeypersons to full union membership rights upon reinstatement or reinitiation; and 6) an order requiring the union to comply with an interim reinitiation policy.

The union argues that it would be unconstitutional for the court to order race-conscious relief in this case. (Def. Memo. of Law at 7). The union relies upon *Adarand Constructors, Inc. v. Pena,* 515 U.S. 200, 115 S.Ct. 2097, 132 L.Ed.2d 158 (1995) and *City of Richmond v. J.A. Croson Co.,* 488 U.S. 469, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989), cases which hold that all racial classifications, whatever their purported purpose, are subject to strict judicial scrutiny. *Adarand,* 515 U.S. at 235, 115 S.Ct. 2097; *Croson,* 488 U.S. at 509, 109 S.Ct. 706.

The facts of *Croson* and *Adarand* are inapposite to the circumstances presented here. In those cases the Supreme Court scrutinized affirmative action programs instituted by a locality and the federal government, respectively, and found the evidence to support such remedial action wanting. *See Croson,* 488 U.S. at 500, 109 S.Ct. 706; *Adarand,* 515 U.S. at 237–38, 115 S.Ct. 2097. By contrast, this case involves the imposition of race-conscious relief after a determination of liability to compel a defendant, several times held in contempt for noncompliance, to obey the court's remedial orders.

In arguing that race-conscious relief is inappropriate, the union recapitulates an argu-

ment previously rejected by the Second Circuit and the Supreme Court. *See EEOC v. Local 638 ... Local 28,* 753 F.2d 1172, 1186–87 (2d Cir.1985) (finding that 29% nonwhite membership goal satisfies the circuit's two-prong test for constitutional validity of race-conscious affirmative action remedy);[5] *EEOC v. Local 638 ... Local 28,* 478 U.S. 421, 444, 106 S.Ct. 3019, 92 L.Ed.2d 344 (1986) ("[Title VII] § 706(g) does not prohibit a court from ordering, under appropriate circumstances, affirmative race-conscious relief as a remedy for past discrimination.... Such relief may be appropriate where an employer or a labor union has engaged in persistent or egregious discrimination, or where necessary to dissipate the lingering effects of pervasive discrimination."). These unequivocal expressions of support for race-conscious relief reveal the weakness of the union's argument.

The court, therefore, enjoins the union from charging fees and back dues to nonwhite journeypersons who seek reinstatement or reinitiation if 1) such individuals were underemployed between 1984 and 1991 as a result of the union's discrimination and 2) were subsequently suspended or terminated from the union because of their inability to pay these fees. The two-year rule is voided and shall not bar a journeyperson from reinitiation or reinstatement to union membership.

The determination as to whether said persons qualify for no-fee reinitiation will be made by the Special Master. Raff's determination will be made upon a consideration of evidence by those seeking reinstatement or reinitiation, rebuttal evidence by the union, and an expert's report.

The expert shall be appointed by the Special Master for the purpose of determining which nonwhite union members and former members' work hours were two or more standard deviations below what would be expected for period from 1984 through 1991. The expert shall issue his or her report within forty-five days of the date upon which he or she is appointed by Raff.

Within two weeks of the date on which the expert's report is issued, the union must notify in writing each member or former member having an hours disparity that he or she is entitled to apply to Raff for no-fee reinitiation or reinstatement. The union shall also provide notice in local newspapers, as the Special Master shall designate. The union shall furnish proof that it has met these notice requirements to the Special Master, who shall notify the court in the event that the union fails to comply with these notification requirements or the union's efforts are deemed inadequate.

Within 60 days of the date by which the union should have provided such notice to suspended or terminated nonwhite journeypersons, the Special Master shall convene a reinitiation hearing (which may be combined with the hearings to determine which journeypersons qualify for back pay, as discussed *infra*). In advance of the hearing, details as to procedure shall be determined by Raff, who will give notice of the same to the union, plaintiffs, and each member or former member who applies for no-fee reinitiation.

At the reinitiation hearing, the union may submit evidence that any journeyperson's hours disparity was not the result of discrimination. If the union fails to present evidence, the applicant for no-fee reinitiation shall prevail. If the union comes forward with such evidence, the applicant is to be given 30 days in which to present evidence of disparate discrimination. The union is to be given 30 days to rebut such members' evidence.

The Special Master shall make a final determination after consideration of all of the

---

5. The Second Circuit found that the first prong of the test, which requires a "clear cut pattern of long-continued and egregious racial discrimination," was satisfied because of the union's "long continued and egregious racial discrimination" and because the union's failure to meet the membership goal shows that the effects of the discrimination had not been eliminated. 753 F.2d at 1186. The court found that the second prong, under which "the effect of reverse discrimination must not be 'identifiable', that is to say, concentrated upon a relatively small, ascertainable group of non-minority persons," was satisfied because "the effects of the affirmative action remedies incorporated in the AAAPO will not unnecessarily trammel the rights of any readily ascertainable group of nonminority individuals." *Id.* at 1187.

evidence of eligibility or ineligibility for no-fee reinitiation within 30 days after the record of the hearing is closed, with notice to the court and the parties.

Within 15 days of such notification, the union shall reinstate affected individuals in full membership, including but not limited to funeral benefits. This schedule renders requiring the union to comply with an interim reinitiation policy unnecessary.

### B. Back pay

■ In vacating the back pay award, the Second Circuit instructed the court "to fashion a remedy that compensates with back pay only those journeypersons who were denied work because of the Union's discriminatory conduct." *E.E.O.C. v. Local 638 ... Local 28*, 81 F.3d 1162, 1177 (2d Cir.1996). It also commanded the court to consider "the contemnor's financial resources and the consequent seriousness of the burden of the sanction upon him." *Id.* (quoting *Dole Fresh Fruit Co. v. United Banana Co.*, 821 F.2d 106, 110 (2d Cir.1987)).

The plaintiffs have proposed procedures that they believe would satisfy these instructions. These include 1) the appointment of an expert by the Special Master to determine the *prima facie* eligibility of nonwhite journeymen for back pay, 2) notification by the union to each member or former member having such an hours disparity that he or she is entitled to apply for an award of back pay within 2 weeks of issuance of expert's report, 3) the presentation of evidence by journeypersons and the union as to the propriety of back pay awards at hearings convened by the Special Master, 4) final determinations by the Special Master as to which journeypersons are entitled to back pay, and 5) the establishment by the union of an escrow account from which journeypersons who qualify for back pay would be paid. (Pl.'s Mem. of Law at 7–9).

Defendant objects to plaintiffs' proposed presumptive award of back pay to all non-white journeypersons (i.e., all whose hours fell two or more standard deviation below what would be expected between 1984 and 1991) because "it would be virtually impossible for the Union to identify and prove the reasons why each individual nonwhite journeyperson with below average hours failed to obtain work at the same rate as other journeypersons." (Def.'s Mem. of Law at 12).

The court finds the union's argument without merit for at least two reasons. First, this argument overlooks the fact that under Title VII victims of discrimination are entitled to receive back pay awards from liable employers. *See Albemarle Paper Co. v. Moody*, 422 U.S. 405, 412, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975) ("[A] plaintiff or a complaining class who is successful in obtaining an injunction under Title VII ... should ordinarily be awarded back pay unless special circumstances would render such an award unjust.").

Second, in light of the union's persistent discrimination and numerous contempt sanctions for non-compliance with the outstanding antidiscrimination orders in this case, its alleged difficulty in meeting its burden of proof may simply indicate the strength of journeypersons claims of discrimination.

Moreover, the Second Circuit found a fundamental defect in the court's back pay remedy was its failure to allow the union to present evidence to rebut the presumption created by the hours disparity that the underemployment was a result of discrimination. *E.E.O.C. v. Local 638 ... Local 28*, 81 F.3d 1162, 1177 (2d Cir.1996) ("Under the district court's approach, a journeyperson would be entitled to receive damages even if there was a legitimate non-discriminatory reason that would explain why the journeyperson was not hired."). The Appeals Court gave examples of rebuttal evidence that might be presented by the union.

> For instance, a journeyperson could have a poor work history of which employers became aware after checking his references, or the journeyperson might only have sought work from contractors who were looking for someone more skilled. Indeed, it may even be the case that the Union can show that a particular journeyperson was unemployed, not because of its own discrimination, but because the contractors were illegally discriminating against the journeypersons. In the foregoing situa-

tions, a backpay award would be inappropriate.

*Id.* Thus, the union's protestations that it would be difficult for it to secure evidence that nonwhite workers' below average work hours did not result from discrimination are surprising since, this is precisely what the court was ordered to allow the union to do.

In leaving the court's statistically-based definition of "underemployment" undisturbed, the Court of Appeals specifically rejected the union's argument that the expert's statistical evidence failed to account for variables other than race that might explain the hours disparity. *Id.* Nevertheless, the union repeats this very argument in its submissions as a rationale for its assertion that it cannot meet its burden of proof. (Def.'s Mem. of Law at 12–14). Obviously, there is no merit in this argument.

Additionally, the union rehashes the argument that it should not be obligated to make back pay awards because the union's business agents were not responsible for the work hours during the relevant period. *Id.* In making this argument, however, the union disregards the Second Circuit's affirmance of the court's finding that the union's business agents had engaged in discrimination and that the effect of this discrimination was not *de minimus.* 81 F.3d at 1174 ("The hours worked by Local 28 journeypersons in the average year is in the millions, and two percent of that is by no means an insignificant number of hours for Local 28 to be distributing unequally among its members."). The Court of Appeals also rejected the union's argument that it could not be held in contempt because the contractors were responsible for the journeypersons' work hours. *Id.* at 1175–77. Therefore, the court finds no merit in the "business agents' responsibility" rationale for the union's assertion that it is unable to meet its burden of proof regarding the entitlement of some journeypersons to back pay.[6]

In view of all these considerations, the following procedures are ordered to determine which nonwhite journeypersons are en-

titled to back pay as a remedy for discrimination. The determination as to whether said persons qualify for back pay will be made by the Special Master. Raff's determination will be made upon a consideration of evidence by those seeking reinstatement or reinitiation, rebuttal evidence by the union, an expert's report on underemployment during the relevant period, and a financial audit report (discussed *infra*, pp. 468–69).

An expert shall be appointed by the Special Master for the purpose of determining which nonwhite union members and former members work hours were two or more standard deviations below what would be expected for the period 1984 through 1991. By virtue of their hours disparity, these individuals will have made a *prima facie* case of entitlement to back pay. The expert shall issue its report identifying which individuals make out such a *prima facie* case of discrimination within forty-five days of the date upon which he or she is appointed by Raff.

Within two weeks of the date on which the expert's report is issued, the union must notify in writing each member or former member having such an hours disparity that he or she is entitled to apply to Raff for back pay. The union shall also provide notice in local newspapers, as shall be determined by the Special Master. The union shall furnish proof that it has met these notice requirements to Raff, who shall notify the court in the event that the union fails to comply with these notification efforts or its efforts are deemed inadequate.

Within 60 days of the date by which the union should have provided such notice to suspended or terminated nonwhite journeypersons, the Special Master shall convene a back pay hearing (which may be combined with the hearing to determine which journeypersons qualify for no-fee reinitiation or reinstatement, as discussed *supra*, pp. 461–62). In advance of the hearing, details as to procedure shall be determined by Raff, who will

---

6. However, the court agrees with the union that, in contemplating back pay awards, the court should take the union's financial state into con-

sideration. (Def.'s Mem. of Law at 11–12). This matter is considered *infra*, pp. 468–69.

give notice of same to the union, plaintiffs, and each member or former member who applies for back pay.

At the back pay hearing, the union may submit evidence that any journeyperson's hours disparity was not the result of discrimination. If the union fails to present evidence, the applicant for back pay shall prevail. If the union comes forward with such evidence, the applicant shall be given 30 days to present evidence of disparate discrimination. The union is to be given 30 days to rebut the evidence of discrimination.

The Special Master shall make a final determination of eligibility or ineligibility for back pay within 30 days of the presentation of all evidence by the relevant parties, with notice to the court and the parties.

Back pay will then be awarded to these individuals in a manner that comports with the report of the financial auditor.

### C. Referral Hall and Job Rotation System

The Second Circuit reversed the court's imposition of a mandatory hiring hall and job rotation system on the Contractors on the grounds that such relief was not minor and ancillary, imposing an impermissible burden on them as non-liable parties. *E.E.O.C. v. Local 638 ... Local 28*, 81 F.3d 1162, 1179–80 (2d Cir.1996). In vacating these remedies, however, the Second Circuit suggested that the district court may fashion a remedy that would impose some burdens on the Contractors without transgressing the law established in *General Bldg., Contractors Ass'n, Inc. v. Pennsylvania*, 458 U.S. 375, 399, 102 S.Ct. 3141, 73 L.Ed.2d 835 (1982) (holding that nonliable party can only be subjected to those provisions of an injunction that are "minor and ancillary").

> [T]he district court is free to order the Contractors to make reports to the district court.... In addition, as the Contractors note, the district court could alter Local 28's referral process by removing those business agents who have been found to be discriminating against nonwhite employees, or by eliminating business agent referrals altogether, and replacing them with a system patterned after the hiring hall, which could be termed a referral hall, in which journeypersons are referred to employers based on the number of hours worked but the Contractors retain the discretion whether to hire any individual worker.

*Local 28*, 81 F.3d at 1180 (citations omitted).

Consistent with these instructions, the plaintiffs request that the court order the establishment of a voluntary referral hall and the elimination of "union business agents or any other union employee or agent representative from participating in the job referral process." (Pl.'s Mem. of Law at 21). These remedies would aid compliance with the O & J and AAAPO by diminishing the union's opportunities to show favoritism to whites in making job referrals. *Id.* at 22. In so doing, these remedies would ameliorate the white/nonwhite hours disparity and increase employment opportunities for nonwhites. Plaintiffs argue that these remedies would comport with *General Bldg. Contractors*, 458 U.S. 375, 399, 102 S.Ct. 3141, 73 L.Ed.2d 835 (1982), because the contractors would retain the discretion to hire and fire whomever they choose—except where referrals for 1) fan maintenance jobs, 2) jobs with out-of-town contractors working in Local 28's jurisdiction, 3) target agreement jobs, 4) jobs with non-signatory contractors, and 5) jobs with contractors under International Agreement, are at issue. (Supplemental Declaration of Paul Kazanoff ("Kazanoff Supp. Dec.") at 2–3). These job categories are exempt because the contractors are compelled to accept referrals from the union in these instances. *Id.* at 2.

The union acknowledges that the Second Circuit has stated that the court may establish a referral hall. (Def.'s Mem. of Law at 19). Given the Second Circuit's instructions and union's concession that a referral hall has been deemed an appropriate remedy by the Court of Appeals, the court hereby orders the union to establish a referral hall. Journeypersons are to be referred to the hall on the basis of hours worked, with those who have accumulated the least work hours being given priority in the referral process. *See Local 28*, 81 F.3d at 1180. The referral hall will thus function as a racially-neutral means

of eliminating the hours disparity between white and nonwhite journeypersons.

The referral hall will not be mandatory for the Contractors, however. In all those job categories in which they now exercise discretion in hiring, the Contractors will continue to decide which individual workers to hire. The Contractors may chose to hire workers from the referral hall on a voluntary basis relative to those job categories in which they do not now exercise discretion in hiring.

This principle being established, the question then presented concerns over which job categories the Contractors, as opposed to the union, now exercise discretion in hiring. The union does not object to the use of a referral hall with respect to 1) out-of-town contractors that are not parties to its CBA, 2) non-signatory contractors, and 3) contractors under International Agreement. (Def.'s Mem. of Law at 19). Moreover, the Contractors concede that they have no standing to challenge the establishment of a referral hall with respect to out-of-town contractors, non-signatory contractors, or contractors under International Agreement. (Affdvt. of William Rothberg, ¶ 9).

Because the Contractors are compelled to accept referrals from the union in these job categories when working in the union's jurisdiction, requiring them to use the referral hall relative to these jobs cannot logically be said to curtail their rights to hire whom they please. In any event, neither the union nor the Contractors object to the establishment of a referral hall with respect to these job categories. Therefore, the court finds that ordering the union to make use of a referral hall with respect to jobs with 1) out-of-town contractors that are not parties to its CBA, 2) non-signatory contractors, and 3) contractors under International Agreement, constitutes minor and ancillary relief. *See Local 28*, 81 F.3d at 1180 (finding sharp curtailment of contractors' ability to employ individual workers an infringement of their rights as non-liable parties under *General Bldg. Contractors*, 458 U.S. 375, 399, 102 S.Ct. 3141, 73 L.Ed.2d 835 (1982)). The union hereby is ordered to make use of a referral hall with respect to those job categories.

## 1. Fan Maintenance and Target Agreement Jobs

Both the union and the Contractors object to plaintiffs' proposal that the referral hall be used with respect to 1) fan maintenance jobs and 2) target agreement jobs. The union argues that the Contractors are not obligated to obtain a referral from the union with respect to these job categories. (Def.'s Mem. of Law at 20). Therefore, the union argues, requiring the Contractors to make use of a referral hall with respect to these job categories would not constitute minor and ancillary relief. *Id.* The Contractors also argue that requiring the use of the referral hall with respect to fan maintenance workers and workers hired pursuant to the target agreement would impermissibly affect their hiring discretion. (Rothberg Affdvt., ¶ 10).

The court finds that it has insufficient evidence to render a decision about the propriety of the referral hall's use with respect to these two job categories. The evidence presented does not make it clear that the Contractors historically have not exercised discretion with respect to the hiring of fan maintenance workers. The status of the second category of employees, those hired with respect to the target agreement, is even less clear. For example, during the course of reviewing the parties' submissions on remand, the court was made aware that the union and the Contractors recently have changed the target agreement in a way that may have a negative impact on compliance with the outstanding orders in this case. Target agreement jobs will now be open to employed workers, whereas these job opportunities historically have been open to unemployed workers, who are disproportionately nonwhite. (Rothberg Affdvt., ¶ 12). Although this change to the target agreement clearly may impact the employment opportunities of the intended beneficiaries of the O & J and AAAPO, it was made without notice to the court. Even as the court acknowledges that the old policy of reserving target agreement jobs to unemployed workers was a voluntary measure, the circumstances and timing of the change raise questions about the motives of the contractors and union in adopting a new policy.

Therefore, the Special Master is ordered to investigate the circumstances surrounding the change in policy with respect to target agreement jobs, including its possible impact on the outstanding orders in this case. The plaintiffs, the union, and the Contractors are ordered to cooperate in Raff's investigation concerning target agreement jobs. In addition, the parties should present evidence to Raff about fan maintenance workers, specifically, concerning whether the union or the Contractors historically has exercised discretion over the hiring of workers for these jobs.

This order of reference is made pursuant to Rule 53, F.R. Civ. P. The Special Master should submit a report and recommendation to the court on the results of his investigation no later than 120 days from the date of this order. After reviewing Raff's report and recommendation, the court will decide whether use of a referral hall with respect to these workers would constitute minor and ancillary relief.

### 2. Business Agent Referrals

■■■ The union acknowledges that the Second Circuit has stated that the court may eliminate business agent referrals. (Def.'s Mem. of Law at 19). However, it objects to the plaintiffs' request that the court ban union business agents from disseminating any job-related information to members. (Dec. of Paul Kazanoff, ¶ 29). The union rationalizes its opposition to the elimination of business agent referrals by acknowledging that, because they prefer to hire "journeypersons with whom they are personally familiar," the contractors disproportionately hire white workers. *Id.* at 20 (quoting *E.E.O.C. v. Local 28*, 889 F.Supp. 642, 679 (S.D.N.Y.1995) (Carter, J.)). Thus, the Contractors contribute to the white/nonwhite hours disparity and deny employment opportunities to nonwhites. *Id.*

The court finds, however, that the elimination of the union's business agents from the job referral process is essential to compliance with the O & J and AAAPO. While the court would like to have confidence that the union would stop the discriminatory dissemination of information of its own volition, nothing in the long history of this case suggests that the union will do so. Therefore, the court is forced to issue a blanket ban on the use of business agents or any other representative of the union from participating in job referral process. This ban means that the agents may give no information on jobs to union members, and may give no information on members to the contractors. Since the Second Circuit has affirmed the court's finding that the union's business agents refer journeypersons to jobs on a discriminatory fashion and do so through the discriminatory dissemination of information, the union has no legitimate argument that this remedy is inappropriate. *See E.E.O.C. v. Local 28*, 81 F.3d 1162, 1173–75.

### D. Retraining

■■■ The court also finds it appropriate to order the union to offer specialty and refresher classes for nonwhite journeypersons who have been laid off during the period from 1984 to 1991 due to a lack of skill. *See Local 28*, 889 F.Supp. at 690. This order is made to ensure that the intended beneficiaries may take advantage of the referral hall.

Notice of this remedy should be given to journeypersons at the same time and in the manner specified *supra*, in the court's discussion of notice to journeypersons concerning the possibility of back pay and no-fee reinitiation.

### E. Referral Hall Monitor and Statistical Expert

■■■ In addition to the back pay award discussed *supra*, pp. 25–30, the court finds it appropriate to order the union to compensate a referral hall monitor and a statistical expert. The referral hall monitor and statistical expert will be selected by the Special Master, David Raff, from among candidates proposed by both the plaintiffs and defendants. These monitors also will work under the supervision of the Special Master. Each monitor shall submit compliance reports to the Special Master on a monthly basis. Raff will then notify the court in the event of the union's noncompliance with the outstanding orders in this case.

While the union attempts to avert financial responsibility for the statistical expert by suggesting that the plaintiff's wish to use the expert to establish the Contractors' liability—a goal that is not remedial—it is primarily the union's persistent noncompliance with the outstanding orders in this case that compels such monitoring. Thus, along with the referral hall monitor, this statistical expert will be employed to ensure that the union affords nonwhite journeypersons employment opportunities equal to those afforded to white workers, consistent with the purposes of the O & J and AAAPO. The referral hall monitor will ensure that nonwhite journeypersons are referred to jobs on the basis of hours worked and that union business agents do not participate in the job referral process. The statistical expert will periodically analyze the work records of journeypersons to determine whether or not a white/nonwhite hours disparity persists in violation of the O & J and AAAPO.

This expert will also conduct analysis to ascertain the role the Contractors in contributing to the white/nonwhite hours disparity. This latter responsibility is especially important given: 1) the union's argument that it is the Contractors—rather than the unions—that are responsible for the industry's discriminatory hiring practices, *Local 28,* 889 F.Supp. at 662–64, and 2) the Second Circuit's finding that the court cannot impose relief that substantially burdens the Contractors without proof of their liability. *Local 28,* 81 F.3d at 1180–81.

Given the union's repeated failure to comply with the court's orders, the court deems supervision of the union's conduct by a referral hall monitor and a statistical expert essential to coerce defendants into compliance with the O & J and AAAPO. Because the union has been found in contempt of court for failure to comply with the outstanding orders in this case, it is appropriate that the defendants bear responsibility for paying the fees of these monitors as a remedy for contempt. This result is permitted by the O & J and AAAPO, which places upon the union an affirmative obligation to investigate and remedy claims of discrimination.

## F. Attorney's Fees

■■ The union also is ordered to pay plaintiffs' reasonable attorney's fees for the time spent preparing for the back pay hearings of individual journeypersons. This remedy is proper in light of the court's finding that the union's contumacious conduct justifies back pay awards to those nonwhite journeypersons who prove their entitlement to such recompense. *See* 42 U.S.C. § 2000e–5(k) (1994) ("In an action or proceeding under this subchapter the court, in its discretion, may allow the prevailing party .... a reasonable attorney's fee (including expert fees) as part of the costs ...").

However, plaintiffs only are entitled to attorneys' fees for those claimants who prevail on their back pay claims. The court agrees with the union that neither Title VII nor applicable case law entitles plaintiffs to attorneys' fees for individual journeypersons who do not ultimately establish that they are entitled to such awards. *See* 42 U.S.C. § 2000e–5(k) (stating that the "prevailing party" is entitled to attorney's fees); *see also Bray v. Alexandria Women's Health Clinic,* 506 U.S. 263, 285, 113 S.Ct. 753, 122 L.Ed.2d 34 (1993) (vacating attorney's fee award under 42 U.S.C. § 1988 because parties did not prevail on underlying 42 U.S.C. § 1985 claim); *Kentucky v. Graham,* 473 U.S. 159, 165, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985) (denying attorney's fees where defendant had not been prevailed against in suit under 42 U.S.C. § 1988 on grounds that "liability on the merits and responsibilities for fees go hand and hand"). Because Title VII is intended "to make the victims of unlawful employment discrimination whole," *Franks v. Bowman Trans. Co.,* 424 U.S. 747, 764, 96 S.Ct. 1251, 47 L.Ed.2d 444 (1976), the court finds that attorney's fee awards to back pay claimants who are unable to demonstrate that they, in fact, were victims of discrimination during the relevant period would be contrary to the statute's remedial purpose. Therefore, plaintiffs can recover fees for time spent in preparation for individual journeyperson's back pay hearings only to the extent that the individual claimants prevail on their claims.

*G. Prejudgment Interest on Expert's Fees*

 In its Contempt Order, the court determined that the union was responsible for paying the expert fees that the plaintiffs incurred during the preparation of their contempt motion. *Local 28*, 889 F.Supp. at 670–71. In addition to the relief outlined above, plaintiffs request an award of prejudgment interest on the expert fees that they incurred during the preparation of their motion for contempt in 1995, which totaled $156,019.78. (Kazanoff Decl. at ¶ 39). They request interest at the New York statutory rate of 9% per annum from May 24, 1995, the date on which the plaintiffs submitted their amended request for expert fees. (Pl.'s Mem. of Law at 26–27). The plaintiffs argue that prejudgment interest is especially appropriate here because the union never appealed that part of the Contempt Order that awarded expert fees. *Id.*

Citing *Morse Diesel Inc., v. Trinity Indus., Inc.*, 67 F.3d 435 (2nd Cir.1995) for the proposition that prejudgment interest is "only appropriate as a means of compensating a prevailing party," the union argues that such an award would be improper in this case because "the City has not even alleged that the award of such interest would be compensatory." (Def.'s Mem. of Law at 23). "In fact, given that the fees will be paid to the plaintiffs' expert," defendant argues, "there is no legitimate basis upon which the City could argue that it would be made whole by such an award." *Id.*

 It is clear that the court may award prejudgment interest to prevailing parties in Title VII cases at its discretion. *See E.E.O.C. v. County of Erie*, 751 F.2d 79, 81 (2nd Cir.1984); *Proulx v. Citibank*, 681 F.Supp. 199, 205 (S.D.N.Y.1988) (Mukasey, J.); *Marshall v. Burger King Corp.*, 509 F.Supp. 353, 355 (E.D.N.Y.1981) (Sifton, J.).

The court has found no law to support plaintiffs' contention that it is fitting and proper for such an award to be made with respect to expert fees, however. It appears that courts have elected to make prejudgment interest available to prevailing parties in Title VII cases only with respect to back pay awards. *See e.g., County of Erie*, 751 F.2d at 81 (affirming award of interest on

back pay awards to victims of sexual harassment); *Marshall*, 509 F.Supp. at 355 (awarding interest on back pay in racial discrimination). Interest has been awarded in these instances in order to make whole victims who have been unlawfully deprived of wages, in particular, to compensate for the time elapsed between defendants' act of discrimination and the court's judgment for the plaintiff. *See County of Erie*, 751 F.2d at 81; *cf., Proulx*, 681 F.Supp. at 205 (refusing to award interest on back pay award to victim of sex discrimination where plaintiff's testimony regarding damages was not credible on key points).

Although the testimony of plaintiffs' expert was integral to plaintiffs' ability to prevail on the contempt motion, the court is not persuaded that an award of prejudgment interest on expert's fees would be consistent with the remedial purpose of Title VII. It is clear, for example, that an award of interest on expert's fees is distinguishable from an award of interest to individual journeypersons who bring successful claims for back pay. Whereas the latter award doubtlessly would function to compensate victims of discrimination for lost wages, whether the former situation involves deprivation and a victim in need of making whole is far from clear. Thus, the court concludes that it is inappropriate to award prejudgment interest on plaintiffs' expert's fees.

*V. Financial Audit*

The court is mindful of its obligation to take into consideration the union's financial state in fashioning relief for contempt. *See Dole Fresh Fruit Co. v. United Banana Co.*, 821 F.2d 106, 110 (2d Cir.1987); *Local 28*, 81 F.3d 1162, 1177 (2nd Cir.1996). Having ordered relief that will have a financial impact on the union, the court hereby orders the union to submit to a financial audit. The audit of the union's finances will be conducted by M.D. Oppenheim and Co. Est., which will work under the supervision of the Special Master and in cooperation with the union.

The auditor will review the union's finances for the purpose of making recommen-

dations to the court concerning the union's ability to cover the costs associated with those remedies ordered above that involve financial obligations. These include but may not be limited to the union's obligations 1) to make back pay awards to certain nonwhite journeypersons, 2) to compensate a referral hall monitor, 3) to compensate a statistical expert who will periodically review the work records of union members to determine whether the white/nonwhite hours disparity persists, 4) to pay attorney's fees incurred by plaintiffs during their preparation of their contempt motion, 5) to pay expert's fees incurred by plaintiffs during the preparation of their contempt motion, 6) to cover the costs associated with notifying nonwhite journeypersons underemployed from 1984 to 1991 of their possible entitlement to no-fee reinitiation and back pay.

The auditor's review shall be completed within 60 days of the issuance of this order. Upon completion of the review, the auditor shall submit copies of its report to the court, the Special Master, and the union.

The Special Master will then review the auditor's report and recommendations in order to make a determination concerning how best to use the funds available to the union for compliance with the financial obligations ordered by the court. Within 30 days of receiving the auditor's report, Raff shall issue a report with his recommendations. In making his recommendations, Raff should consider the relative import of each category of financial remedy to effectuating the purposes of the O & J and AAAPO. The Special Master is free to consider a *pro rata* reduction of the back pay award in light of the union's financial status, as recommended by both the plaintiffs and the union. (Pl.'s Mem. of Law at 19; Def.'s Mem. of Law at 18).

Raff's recommendations will be subject to the final approval of the court. The court will issue a final order adopting or modifying the Special Master's recommendations for disbursal.

IT IS SO ORDERED.