EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, et al., Plaintiffs,

v.

LOCAL 638 ... LOCAL 28 OF THE SHEET METAL WORKERS' INTERNATIONAL ASSOCIATION, et al., Defendants.

No. 71 Civ. 2877(RLC).

United States District Court, S.D. New York.

Oct. 19, 2000.

Eliot Spitzer, Attorney General of the State of New York, New York City, Carrie H. Cohen, Eric Komitee, of counsel, for plaintiff the New York State Division of Human Rights.

Michael D. Hess, Corporation Counsel of the City of New York, Barbara Mehlman,

of counsel, New York City, for plaintiff the City of New York.

Katherine E. Bissell, Acting Regional Attorney, Equal Employment, Opportunity Commission, New York District Office, Ann Thacher Anderson, of counsel, New York City, for plaintiff the Equal Employment Opportunity Commission.

Edmund P. D'Elia, P.C., Edmund P. D'Elia, of counsel, New York City, Highsaw, Mahoney & Clarke, P.C., John O'B. Clarke, Jr., of counsel, Washington, DC, for defendants.

## OPINION

ROBERT L. CARTER, District Judge.

## BACKGROUND

This litigation has occupied the courts for nearly 30 years. A full exploration of the facts in this matter and its procedural history would be a laborious undertaking. Fortunately, such an endeavor is unnecessary for the resolution of the issues presently before the court, and an understanding of certain aspects of the case will suffice.

In 1995, the court found the defendant Sheet Metal Workers' Local Union No. 28 (the "Union" or "Local 28") to be in contempt of court for numerous violations of the court's Order and Judgment ("O & J") entered in 1975 and its Amended Affirmative Action Plan and Order ("AAAPO") entered in 1983. *Equal Employment Opportunity Commission v. Local 638*, 889 F.Supp. 642 (S.D.N.Y.1995) (Carter, J.).[1] The court's decision was based on the Union's failure to achieve a 29.23% nonwhite membership goal and to otherwise meet the requirements of the O & J and AAAPO. *Id.* The court's contempt order mandated a variety of remedies, including back pay to underemployed nonwhite journeypersons as a remedy for the Union's practice of only helping white journeypersons

find jobs. *Id.* at 669–70. The back pay remedy was supported by both a coercive and a compensatory rationale (i.e. to prompt the Union to comply with the affirmative action program and to compensate the victims of the Union's noncompliance). *Id.* at 670.

On appeal, the Second Circuit initially vacated and remanded the court's award of back pay. *EEOC v. Local 638*, 81 F.3d 1162 (2d Cir.1996). The Court of Appeals reasoned that insofar as the award was a compensatory sanction, the court needed to fashion a more precise mechanism for determining who was entitled to back pay; insofar as it was coercive, the court needed to consider further the Union's ability to pay such a sanction. *Id.* at 1177. In response to the former concern, this court ordered that the Special Master in this case, David Raff, conduct individual hearings to determine who would be entitled to back pay relief. *EEOC v. Local 638*, 13 F.Supp.2d 453, 465–66 (S.D.N.Y.1998) (Carter, J.). This plan of determining who would be entitled to back pay was affirmed by the Second Circuit. *City of New York v. Local 28*, 170 F.3d 279, 284–85 (2d Cir. 1999). To address the Court of Appeals' second reservation regarding the coercive rationale, the court held a hearing during June of 2000 to determine the financial ability of the Union to satisfy the back pay award.

## BURDEN OF PRODUCTION

As a preliminary matter, the entire question of the burden of production—a question to which both parties dedicate a great deal of argument—is in the end academic. It is true that the hearing was originally ordered in response to the mandate from the Court of Appeals that the court consider the Union's finances before applying a coercive sanction. *EEOC v. Local 638*, 13 F.Supp.2d at 470–71. The

---

1. For the sake of brevity, "Equal Employment Opportunity Commission" will hereinafter be  referred to as "EEOC" in all case names.

role of the hearing changed, however, following the more recent Court of Appeals decision. That decision categorically affirmed the court's award of back pay based on its compensatory rationale. *City of New York v. Local 28,* 170 F.3d at 284–85 (discussing district court's award of back pay solely as a compensatory remedy and stating the "back pay remedy as structured by the district court is affirmed"). While the ability to pay (and the burden of production on this issue) is an entirely relevant question for a coercive sanction, it is unnecessary for establishing a compensatory sanction. *See United States v. United Mine Workers of America,* 330 U.S. 258, 303–04, 67 S.Ct. 677, 91 L.Ed. 884 (1947); *EEOC v. Local 638,* 889 F.Supp. at 669.

In light of the most recent Court of Appeals decision, the hearing regarding the Union's financial status was necessary to resolve the pragmatic concern of *how* this back pay award was to be paid, not whether the Union could afford to pay it. Nonetheless, in determining how the award will be paid, the court finds that the Union can afford the back pay award (and therefore a contempt sanction under either rationale is justified).[2]

## THE BACK PAY AWARD

The total amount of the back pay award has not yet been established. The amount will be determined following individual hearings which will be conducted by the court.[3] It is likely that this amount will be in excess of what the Union is able to pay at present and could even exceed twelve million dollars.[4] *See EEOC v. Local 638,* 81 F.3d at 1177.

The Union can currently contribute $1 million and remain economically viable. Local 28 derives almost all of its revenue from its membership dues and assessments.[5] (Tr. 38, 441).[6] These funds are then deposited into a general fund from which the Union pays its expenses. (Tr. 446). Before the hearing, the court appointed an independent accounting firm, M.D. Oppenheim & Company, to review the financial records of Local 28 to determine the extent to which it could satisfy a back pay award. Stanley J. Moskowitz, a Certified Public Accountant with the M.D. Oppenheim firm, testified that as of December 31, 1999, the Union's unrestricted cash assets equaled $2,035,076. (Tr. 32). The Union can afford to pay $1 million of this amount and still remain financially sound. (Tr. 32–33).

Moskowitz supported the argument that the Union could expend this amount through a rather sophisticated analysis. He explained that a "current ratio" compares the amount of cash assets to the amount of expected liabilities. (Tr. 33). Moskowitz further testified that should the Union only have cash assets in the amount of $1 million, it would still retain close to a

2. Based on the testimony and evidence from the hearing, the court is persuaded that the Union can afford the back pay award even assuming that the burden of production on this issue is borne by the plaintiffs.

3. It would be the court's preference that these hearings be conducted, as originally envisioned, by the Special Master. *See EEOC v. Local 638,* 13 F.Supp.2d at 465–66. However, that procedure would add another level of litigation, since the Union would probably appeal each of the Special Master's decisions to the court, thereby accruing additional delay to this seemingly never ending case.

4. The Union correctly points out that this twelve million dollar figure for lost wages was established before the court refined the means of determining who was owed back pay. As such, this figure may very well be too high. Even so, the amount does evince the potential that the award will be several million dollars and is the only estimate which is presently in the record.

5. Dues are a set amount of money which is paid to the Union every month by each member. Assessments are a percentage of the member's hourly wage which is deducted from his paycheck and paid to the Union by the member's employer.

6. "Tr." refers to the transcript for the hearing held from June 20 to June 29, 2000.

two to one current ratio.[7] *Id.* In other words, it would have nearly two dollars in cash assets for every one dollar of expected liabilities. A current ratio of two to one is considered, across many different businesses and not-for-profit organizations, to be financially healthy.[8] *Id.*

Although its own expert witness concedes that it can currently expend $750,000 (Tr. 260), the Union has offered two main arguments to rebut the contention that it can presently pay out $1 million. First it contends that it has an additional liability of approximately $700,000 for a computer system which is necessary to comply with the court's earlier orders. It argues that this liability was not considered by the court's expert when he made his calculations about how much the Union could afford to spend. This argument highlights two erroneous assumptions upon which the Union's expert, James Kokolas, relied. These errors undermine the validity of his conclusions. The Union will not pay for the computer system this year. The Union's auditor and financial secretary admitted that Local 28 only spent $36,000 for the system in 1999, that it had not yet expended any additional funds and that such money would likely be spent over time. (Tr. 195, 494). The Union cannot budget the expense for the year 2000 when it anticipates paying for the system in the future.

An additional faulty assumption made by Kokolas is that many of his calculations regarding Local 28's financial position project a five percent reduction in revenues for 2001. (Def.Ex. 48(d)). He justified this estimation by arguing that 1999—the year which was the basis for most of the experts' calculations—was a "banner year" and that the past several years demonstrated a fluctuation in revenues and expenses. (Tr. 263). Such a projection is overly speculative and unwarranted, however, especially in light of the fact that the most recent figures demonstrate that the Union is doing as well if not better in 2000 than it did in 1999.[9] (Moskowitz letter to the court dated Sept. 5, 2000).

The Union also argues that it cannot expend $1 million presently out of its cash reserves because this would leave it vulnerable to an unexpected future economic downturn. The court finds this argument to be without merit. The calculation of the current ratio takes this into account. Having twice the amount of cash assets available than expected liabilities will allow for unpredicted economic variances.

7. The Union contests this point by arguing that subtracting $1 million from its cash assets would actually leave it with a current ratio of 1.7 to 1. Moskowitz testified that a two to one ratio is a good indication that a business is financially strong, but he never contended that anything less than that would indicate that a business was in jeopardy. Moskowitz did unequivocally state that the Union presently could afford up to $1 million. This suggests that, in his expert opinion, Local 28 would be economically secure contributing that amount even if doing so created a current ratio which is slightly less than two to one.

8. The Union's auditor, Edward Goldstein, testified that paying $1 million from Local 28's cash assets, "might not raise a concern, but it could be an indicator that there might be some difficulty in the ensuing year." (Tr. 203–04). The fact that Goldstein offered this tentative (and overly speculative) response rather than conceding outright that the Union could afford to pay $1 million presently, is insufficient to contradict the earlier testimony of the court appointed expert. If anything, Goldstein's testimony supports the proposition that such an expenditure would not be cause for alarm.

9. Moskowitz indicated in his recent letter to the court that the Union's "Cash and Cash Equivalents" increased approximately 16% during the period of March 31 to June 30, 2000. The Union also reported a profit of $70,918 during the period of April 1 to June 20, 2000, despite the "extraordinary litigation expenses" which would "presumably [be] accounted for" during that time. Moskowitz also noted that revenues for the first half of 2000 were up 9% from the same period in 1999. Moskowitz concluded: "I continue to note no items which would cause me to change any of my previous testimony." (Moskowitz letter to the court dated Sept. 5, 2000).

In addition, the Union apparently is unlikely to suffer significantly from downturns in the construction market. The leaders of the Union testified that it is a very resilient organization and that it has survived economic difficulty in the past by cutting expenses and by raising dues and assessments. (Tr. 485–87, 576–77). Additionally, even if the construction market begins to suffer and a particular employee is unemployed or underemployed, it is not likely that the employee will terminate his Union membership. The benefits of Union membership are significant: better opportunity to secure work (Tr. 172–73, 521), more than double the pay [10] (Tr. 371), disability benefits (Tr. 367), a pension plan (Tr. 522) and extensive health insurance (Tr. 366–67). The cost of membership for the worker is relatively low.[11] Therefore, even in times of trouble, the amount derived from dues would be unlikely to decrease. Even revenue derived from assessments would be slow to decline. When there is a shortage of work, the first individuals to lose their employment are typically the non-union laborers.[12] Union employment, therefore, would not suffer from periods of low employment in proportion to the entire labor force. As such, assessments on Union workers' wages would be similarly protected. The court finds that the Union can afford to spend $1 million presently from its reserves and remain financially viable.

The Union can also afford to provide an additional $1.6 million within six months.

It can do this by either selling or mortgaging its real estate holdings. The Union owns commercial properties at 195–197 Mineola Boulevard in Mineola, New York (the "Mineola Property") (Tr. 114–116; Joint Ex. 2 ¶¶ 1,7) and at 500 Greenwich Street in New York City (the "Greenwich Property") (Tr. 130, Joint Ex. 2 ¶¶ 2,5). It is undisputed that selling the Mineola Property would garner approximately $825,799 after closing costs and paying off a mortgage balance. (Joint Ex. 2 ¶ 8, Pls.' Ex. 14(c)). The Union would then be forced to pay $10,200 annually to rent the space that it currently occupies in Mineola.[13] (Joint Ex. 2 ¶ 10). It would also forego any net profits derived from the property which were $81,489 in 1999. (Tr. 120). The total cost therefore of selling the Mineola property for the Union would be $91,689 per year.

The Union could earn $1,104,000 from selling the Greenwich Property. (Tr. 141; Joint Ex. 2 ¶ 6). If it sold the building, the Union would be forced to pay rent for the space it currently occupies at an annual rate of $142,714. ( Tr. 145; Joint Ex. 2 ¶ 9). The Greenwich Property is presently operating at a loss of $69,549 per year. (Tr. 146). As such, the total cost for the Union of selling the building, if one subtracts the amount of annual loss from the amount of annual rent, would be $73,165.

The total revenue which could be derived from selling the Mineola Property and the Greenwich Property would be

---

**10.** A member of the Union earns $55.52 per hour, while a non-union worker earns between $8 and $27 per hour. (Tr. 371).

**11.** Members of the Union currently pay $40 per month in dues and 1 3/4% of their wages in assessments. (Joint Ex. 1, ¶¶ 2, 5). The current hourly wage for a Union member under the collective bargaining agreement is $55.52. (Tr. 371). Therefore, based on a 40 hour work week, the member would pay approximately $38.64 per week in assessments. As a result, it currently costs the average worker about $200 per month to belong to the Union.

**12.** One of the plaintiffs' experts, Philip Ross, testified that Union workers enjoy a level of job security in the normally fickle construction industry which non-union laborers do not. (Tr. 172–73).

**13.** This rental rate could be secured by the Union demanding this rental arrangement as a condition of sale through a sale-lease back agreement. Such an agreement would be beneficial to both the buyer and the seller. The seller (in this case the Union) would be able to lock in a rental rate. The buyer would be guaranteed to have at least a portion of the property rented, without the burden of finding a new tenant. (Tr. 119–120).

$1,929,799 ($825,799 plus $1,104,000). The total annual cost to the Union of selling both properties would be $164,854 ($91,689 plus $73,165). This amount could be paid for by the additional $150,000 that the Union concedes it will have available each year to fund a back pay award.[14] (Def.'s Post–Hearing Memo. of Law, p. 1).

The plaintiffs have offered other options to raise money through the Union's real estate holdings, such as mortgaging both properties or mortgaging one property while selling the other. (Pls.' Post–Trial Memo. of Law, pp. 16–18). Both of these options seem to be feasible. It is undisputed that the Union could secure a $700,000 mortgage on its Mineola Property. ( Tr. 110; Pls. Ex. 14(b)). The total annual payment on such a loan would be $70,490. (Tr. 111–12; Pls. Ex. 14(b)). Since the property generates a net income of $81,489 (Tr. 109; Pls. Ex. 14(a)), the Union could afford to remain in its current space rent free and still generate a profit of approximately $11,000.

It is also undisputed that the Union could obtain a mortgage on the Greenwich Property in the amount of $945,000 (Tr. 136; Pls. Ex. 15(b)) with an annual debt service payment on the loan of $95,161 (Tr. 137). Assuming the Greenwich Property continues to produce the loss it sustained in 1999 of $69,549 (Tr. 138; Joint Ex. 2 ¶¶ 11, 13; Pls. Ex. 15(a)) the total net expense of mortgaging the property would be $164,710.

The total funds which could be derived from mortgaging both properties, therefore, would be $1,645,000. The total annual cost of mortgaging both properties would be $153,710 (the $164,710 loss on the Greenwich property, minus the $11,000 profit on the Mineola Property). Again, this additional cost could be covered by the funds which the Union concedes it will be able to dedicate to a back pay award each year. *See supra* p. 391.

The Union could also sell the Greenwich Property which is operating at a loss and mortgage the Mineola Property, thereby retaining the profitable real estate. This would represent an annual cost to Local 28 of $62,165 (the annual net cost to the Union of selling the Greenwich Property ($73,165) minus the net profit it would retain after mortgaging the Mineola Property ($11,000)).

The Union contends that it is unable to raise an additional $1.6 million from the mortgage or sale of its properties and instead argues that it can only offer $500,-000. Local 28 does not dispute any of the above figures, but only the effect that a sale or mortgage will have on the viability of the Union. This $500,000 amount was provided by the defendant's expert, Kokolas, during the hearing. (Tr. 261). Kokolas apparently arrived at this figure based on the monthly mortgage payments he thought the Union could afford. This analysis suffers from the same two errors discussed earlier. First, he assumes that the Union will lose $700,000 from its reserves *this year* to pay for court ordered computer systems (Tr. 264) and that the Union's revenues will decrease by five percent in 2001 (Def.Ex. 48(d)). As was made clear earlier, these assumptions are erroneous and/or unwarranted. *See supra* p. 389.

Second, the Union contends that selling or mortgaging the properties may leave it vulnerable in the event of an economic downturn. The properties, it argues, may be necessary for collateral in the event that it requires a loan during economic troubles. The court has already considered and dismissed this argument, finding that the union can remain strong even in a

---

14. Plaintiffs argue that this additional expense may be paid by the $150,000 which will be earned through the wage package increase contained in the Local 28 Collective Bargaining Agreement. These funds alone are insufficient, however. If the Union sells its proper-ty, it will incur an additional *annual* expense of $164,854. The total amount of the wage package increase, on the other hand, is only $150,000 for the next *two years*, or an average of $75,000 per year. (Pls.Ex. 32(e)).

weak economy. In addition, when Moskowitz calculated a current ratio of two to one, this calculation was based on the Union's cash assets alone. Under his calculations, Local 28 would be healthy even if it had no real estate holdings whatsoever.

The court requires the Union to provide $1.6 million within six months. The court envisions that these monies may be obtained through a sale and/or mortgage of both of the Union's properties, but the Union is free to supply these funds through any means that it wishes. These funds are, of course, in addition to the $1 million which the Union must presently contribute.

Finally, the Union is also ordered to pay $900,000 at the end of every year with the first payment due on December 31, 2001,[15] until all the back pay awards are satisfied.[16] The court finds that the Union may accomplish this through restoring its dues and assessments to their earlier levels. In July, 1997, Union officials decreased the dues from $51 to $40 a month. (Joint Ex. 1 ¶¶ 2, 5). In January, 1998, officials decreased assessments from 2% of the wage package to 1 3/4%. *Id.* Moskowitz testified that based on figures from 1999, the Union would raise an additional $894,268 from restoring the dues and assessments to their original levels. (Tr. 41–44).

Plaintiffs have requested that defendants contribute $1,050,000 per year. They contend that Local 28 concedes it can pay $150,000 with dues and assessments at present levels. Plaintiffs therefore add this figure to the $900,000 which can be raised by restoring dues and assessments to their pre-reduction levels. The court has already determined that the Union's real estate holdings may be sold or mortgaged to raise funds to be contributed toward the back pay award. Local 28 is only able to do this if the $150,000 is dedicated to cover losses related to this sale or mortgage. The court, therefore, will only require the defendant to make annual deposits in the amount of $900,000.

The Union offers several arguments to rebut a required contribution of $900,000 per year. First, the defendant dedicates a substantial amount of energy arguing that the court has no authority to raise dues and assessments or to shift the financial burden to the Union's membership to pay for Local 28's debts. To the extent that the defendant intends this argument to apply to the court's action in restoring the dues to their original levels, it is without merit. The Union concedes that the reductions in 1997 and 1998 of the dues and assessments were "temporary" and as such, they may be restored to their original levels without the consent of the membership. (Tr. 360, 442, 488–89). Furthermore, the mere fact that the court is imposing a sanction against the Union which may be paid in part by member dues and assessments does not make that sanction inappropriate. Since

---

15. If the Union feels that making payments on a date other than December 31 each year would be more appropriate, then it is free to request that the court reconsider this issue.

16. It is presently impossible to determine how long the Union will be required to make these $900,000 annual payments because Local 28's total liability for back pay is not yet known. The plaintiffs and the Special Master shall provide the court with a list of all persons who claim to be entitled to back pay. After this list is submitted, the court will set a schedule for hearings during which the individual claimants must establish (through the procedures which have already been approved by the Second Circuit in *City of New York v. Local 28*, 170 F.3d at 284–85) their right to back pay and the amount which they are owed. At the close of the hearings, the court will be able to identify the total amount of Local 28's liability. If this amount is so large that complete satisfaction would require the court to monitor the Union's annual payments for a number of years into the future which the court considers to be unacceptable, the court may decide to reduce the liability of the Union for its back pay obligations. In that case, the court will apportion the funds on a pro rata basis to those individuals who are entitled to back pay. The sooner that these awards can be determined and this matter can be resolved, the better it will be for all parties.

the majority of the Union's revenue is raised through dues and assessments, it would be impossible to fashion a sanction against them which was not, to some extent, paid by the members. The court is not imposing a new, unwarranted burden on the membership. Rather, it is simply requiring that the Union restore the dues and assessments to the level to which the membership has already agreed.

The Union offers a second argument against restoring dues and assessments to their earlier level. It contends that these restorations would cause workers to leave the Union, thereby reducing membership. The court disagrees. Restoring the dues to $51 per month and the assessments to 2% would only raise the average worker's annual expenditure by approximately $390. (Tr. 57–58). In light of the many benefits of union membership, see supra p. 390, the court is unpersuaded that this increase would cause any noticeable detriment to the union's membership retention efforts.

The defendant also argues that the court should not substitute its own judgment of the effect of raising dues and assessments on membership for that of the Union's elected leaders. (Def.'s Post–Hearing Memo. Law, pp. 21–22). The court declines, however, to give deference to the elected leaders' judgment when there is no factual basis for their beliefs. Defendant's only argument to support the leaders' hypothesis is that during the period of reduced fees and assessments, union membership rose 26%. Id. at 21. There is no evidence, however, that the reduction in fees *caused* the increase in membership. Indeed, the increase in membership could be attributed to an increase in the total number of sheet metal workers caused by the exceptional growth of the construction industry. The unsupported beliefs of the Union leadership are insufficient to contradict the rational inference that an increase in dues and assessments should not create a discernable decrease in membership.

The Union raises a final argument against this part of the sanction which is similar to its argument against other aspects of the sanction: that it is impossible to determine the future economic climate and as such, awards based on money which the Union does not yet have are too speculative. As a matter of law, though, the court is free to impose a sanction which is based upon an informed prediction of a party's future economic condition. *Cf. Autowest, Inc. v. Peugeot, Inc.*, 434 F.2d 556, 565–66 (2d Cir.1970) (holding that evidence of projected lost income of the plaintiff was properly admitted to help calculate damages). It is evident that no one can predict the future of the construction industry. Plaintiffs have made clear, however, that there is nothing to indicate that there will be an economic downturn and that even if there were a recession, it is doubtful that the Union would suffer its full force.[17] *See* discussion *supra,* pp. 389–90. As such, the court feels confident in imposing these sanctions based on the current information. Obviously, if the Union experiences a dramatic change in its economic condition, it is free to come before the court at that time and argue that it is impossible for it to comply with the court's order. *See Badgley v. Santacroce*, 800 F.2d 33, 37 (2d Cir.1986) (noting that "an inability to comply with an order requiring the payment of money because of poverty or insolvency will generally be a defense to contempt"); *EEOC v. Local 638*, 13 F.Supp.2d at 459 (holding that a party may "defend against the contempt sanction by showing that circumstances have arisen, unforeseeable when the order was issued, that make compliance with the court's order presently impossible").

## ESCROW FUND

The court finds that all of these funds which Local 28 must contribute toward the back pay award should be depos-

---

**17.** In fact, the most recent economic figures suggest that the economic prosperity of the construction industry continues. (Moskowitz letter to the court dated Sept. 5, 2000).

ited into an escrow account. The creation of such an account is within the court's equitable powers. *See, e.g., Meyerson v. Werner,* 683 F.2d 723, 726 (2d Cir.1982) (approving the placement of the deed to a contemnor's house in escrow until he paid his contempt sanction). An escrow fund would be practical in this case because the monies will be deposited over a number of years. Additionally, an escrow fund would provide the flexibility to easily disperse funds to those individuals who, through the hearings, are determined to be entitled to back pay.

Furthermore, the defendant is before the court in contempt for the second time in this litigation.[18] It is already resolved that the Union has disobeyed both the O & J and the AAAPO. *See EEOC v. Local 638,* 81 F.3d 1162. As such, it is necessary to have additional assurances that it will comply with the order in this instance and that these funds will be available for the payment of the back pay sanction. *See Weinman v. Local 40,* 1974 WL 1123, at *9 (S.D.N.Y. July 18, 1974) (Griesa, J.) (holding that it was appropriate to order contempt fines be paid into an escrow account when the purpose of the contempt sanction was "to prevent further violations of the court orders and to compel obedience to those orders"). Obviously, any money remaining in the escrow fund after all of the back pay awards have been satisfied, will be returned to the Union.

## CONCLUSION

The Union will presently deposit $1 million with the clerk of the court who will place these funds in an interest bearing escrow account. The Union shall deposit another $1.6 million within six months with the clerk who shall place this amount in that same account. The Union will also add $900,000 per year, on the last day of each year, to this fund by depositing it

with the clerk. The first $900,000 payment will be due on December 31, 2001. Local 28 will make these $900,000 annual deposits for a period of years which will be determined by the court following the individual back pay hearings. The fact that the number of years for which the Union will be obligated to make these payments has not yet been resolved will not justify a delayed deposit by the Union. The Union is ordered to make these $900,000 annual payments even while the back pay hearings are pending.

**IT IS SO ORDERED.**

---

**18.** The Union was first found to be in contempt in 1982, *EEOC v. Local 638,* 1982 WL 445 (S.D.N.Y. Aug.16, 1982) (Werker, J.), in a decision which was affirmed in relevant part by the Second Circuit, 753 F.2d 1172 (2d Cir.1985), and by the United States Supreme Court, 478 U.S. 421, 106 S.Ct. 3019, 92 L.Ed.2d 344 (1986).